UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANNA SCHNITTER,<br><br>    Plaintiff,<br><br>    -against-<br><br>EVERLAW, INC.,<br><br>    Defendant. | Civil Action No:<br><br><br>**NOTICE OF REMOVAL** |

Pursuant to 28 U.S.C. Sections 1332, 1441, and 1446, Defendant Everlaw, Inc. ("Everlaw") hereby notices the removal of this action, which Plaintiff Anna Schnitter ("Plaintiff" or "Schnitter") commenced against Everlaw in the Supreme Court for the State of New York, New York County, captioned *Anna Schnitter v. Everlaw, Inc.*, Index No. 652875/2026 (the "State Court Action"), to the United States District Court for the Southern District of New York. The grounds for removal are as follows:

1. On May 18, 2026, Plaintiff commenced the State Court Action by filing the Complaint against Everlaw asserting violations of New York Labor Law Section 191 ("NYLL § 191"), New York Labor Law Section 191-c ("NYLL § 191-c"), New York Labor Law Section 215 ("NYLL § 215"), and New York Labor Law Section 740 ("NYLL § 740"), as well as Breach of Contract, Unjust Enrichment, Breach of Good Faith and Fair Dealing, Negligent Supervision, and Negligent Retention claims. *See* Exhibit 1.

2. On May 19, 2026, Plaintiff emailed a copy of the Complaint to Everlaw's counsel. *See* Declaration of Madeline B. Gayle, Esq. ("Gayle Decl.") at ¶3. Everlaw accepted service on

FP 63693254.3

the same day. *See id.* at ¶4. Plaintiff's counsel agreed to a 45-day extension of time, or to July 6, 2026, to answer, move, or otherwise respond to the Complaint. *See id.* ¶2, 5.

3.    Accordingly, Everlaw's Notice of Removal is timely because it was filed within 30 days of the date Everlaw first received the Complaint. *See* Gayle Decl. ¶6; *see also* 28 U.S.C. Section 1446(b)(1).

4.    In accordance with 28 U.S.C. Section 1446(a), a copy of the Complaint, together with all process, pleadings, and orders served upon Everlaw, as contained in the State Court Action record, is attached hereto as Exhibit 1.

## VENUE

5.    The Supreme Court of New York, County of New York, is located in the Southern District of New York.

6.    Therefore, venue for purposes of removal is proper under 28 U.S.C. § 1446(a) because the Southern District of New York is the district court for the district and division within which the Complaint is pending.

## BASIS FOR REMOVAL: DIVERSITY OF CITIZENSHIP

7.    This Court has jurisdiction over this action pursuant to 28 U.S.C. Section 1332(a) because this case involves an amount in controversy that exceeds $75,000, exclusive of costs and interest, and complete diversity of citizenship exists.

8.    The parties are completely diverse. Upon information and belief, Plaintiff is a resident of the State of New York. *See* Exhibit 1, at ¶2 and Exhibit 2, at ¶2.

9.    Everlaw is a corporation organized under the laws of Delaware, and its principal place of business is located at 2101 Webster Street, Suite 1500, Oakland, CA 94612. *See* Exhibit 2, at ¶3. "For diversity purposes, a corporation is considered a citizen of the state in which it is

2

incorporated and the state of its principal place of business." *Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 48 (2d Cir. 2012). Thus, Everlaw is considered a citizen of Delaware and/or of California, and not of New York.

10.    Although Plaintiff does not quantify the exact amount of damages, she asserts in the Complaint that she "seeks compensatory damages in excess of the jurisdictional minimum [and] liquidated damages." *See* Exhibit 1 at "WHEREFORE" clause.

11.    This Court has consistently held that the removing party may make an assertion in the notice of removal as to the amount in controversy when a complaint does not contain a specific amount in controversy. *See Cont'l Cas. Co. v. Hopeman Bros., Inc.*, No. 17-CV-00688 (ALC), 2018 WL 1581987, at *9 (S.D.N.Y. Mar. 27, 2018) ("In a case involving removal, a court looks 'first to the plaintiffs' complaint and then to [defendant's] petition for removal' to determine the amount in controversy." (quoting *Mehlenbacher v. Akzo Nobel Salt, Inc.*, 216 F.3d 291, 296 (2d Cir. 2000)).

12.    Everlaw's assertion of the amount in controversy "need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold" and "should be accepted when not contested by the plaintiff or questioned by the court." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 87-89 (2014); *Jean-Louis v. Carrington Mortg. Servs., LLC*, 849 F. App'x 296, 299 (2d Cir. 2021) (holding that although plaintiff clarified actual damages were $60,000, the amount in controversy still exceeded $75,000 because the civil theft claim permitted treble damages up to $180,000).

13.    The amount in controversy in this matter exceeds $75,000.[1] For example, Plaintiff asserts a claim under NYLL § 191 based on allegedly unpaid commissions. *See* Exhibit 1, at

---

[1] By including an estimate of the amount of damages in controversy, Everlaw is not admitting that Plaintiff is entitled to any damages.

¶¶239-248. A prevailing plaintiff on such a claim may recover the amount of unpaid wages and liquidated damages equal to 100% of the wages found due. *See* N.Y. Lab. Law § (1-a). *See also Liang v. USA QR Culture Indus. Dev. LLC*, 704 F. Supp. 3d 408, 413 n.3 (S.D.N.Y. 2023).

14.    Plaintiff contends that she did not receive commissions on at least ten separate "deals." *See* Exhibit 1, at ¶246. As one example, Plaintiff alleges she had "closed two deals in October worth respectively $250[,000.00] and $20[,000.00], and the payments she has received since do not reflect either of those commissions." *Id*. at ¶247.

15.    Accepting Plaintiff's assertions as true solely for purposes of determining the amount in controversy, and applying the commission structure outlined in the Sales Incentive Plan incorporated into the Complaint (*see id.* ¶6), the commissions allegedly owed on those two transactions total approximately $36,775. With the addition of liquidated damages under NYLL § 198(1-a), the amount in controversy attributable to those two transactions alone increases to approximately $73,550. Plaintiff further asserts that commissions were improperly withheld on at least eight additional transactions. *See* Exhibit 1, at ¶246. While the details of these additional transactions are not expressly alleged in the Complaint, it is a plausible inference—given the commission structure and the number of transactions alleged—that the amount in controversy with respect to all commissions owed exceeds the jurisdictional threshold required by 28 U.S.C. § 1332(a).

16.    Moreover, Plaintiff's retaliation claims under NYLL § 215 provide an additional basis for concluding that the amount in controversy exceeds $75,000. Although Everlaw denies that Plaintiff is entitled to any damages or other relief, Plaintiff seeks remedies under § 215 that include compensation for alleged lost wages, liquidated damages of up to $20,000, attorneys' fees, and compensatory damages for emotional distress. *See* Exhibit 1, ¶¶289-292 and "WHEREFORE"

clause. *See Belizaire v. RAV Investigative & Sec. Servs. Ltd.*, 61 F. Supp. 3d 336, 366 (S.D.N.Y. 2014) ("The NYLL does not specifically list emotional distress damages as a remedy available for unlawful retaliation, but it does authorize granting of "all appropriate relief," and courts have found emotional distress damages to be an appropriate award."). Courts in the Second Circuit have recognized the availability of emotional distress damages in NYLL § 215 retaliation actions, and awards for garden-variety damages alone have frequently ranged from $30,000 to $125,000. *See Olsen v. Cnty. of Nassau*, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009) ("Garden variety emotional distress claims generally merit $30,000 to $125,000 awards."). Accordingly, even apart from the damages sought in connection with Plaintiff's NYLL § 191 claim—as well as the damages sought under the other causes of action, *i.e.*, NYLL § 191-c, NYLL § 740, Breach of Contract, Unjust Enrichment, Breach of Good Faith and Fair Dealing, Negligent Supervision, and Negligent Retention claims—the damages and other relief sought under Plaintiff's § 215 retaliation claim independently demonstrates that the amount in controversy exceeds the jurisdictional threshold required under 28 U.S.C. § 1332(a).

17.     Accordingly, based on Plaintiff's own allegations, together with the liquidated and potential emotional distress damages recoverable under NYLL, Everlaw has established that the amount in controversy exceeds $75,000. Everlaw denies Plaintiff's allegations and that she is entitled to any recovery. Nevertheless, for purposes of removal, Plaintiff's own allegations establish that the amount in controversy exceeds the jurisdictional threshold required by 28 U.S.C. § 1332(a).

18.     Because the amount in controversy exceeds $75,000 and complete diversity of citizenship exists, this action is removable pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

19.    Everlaw has arranged for service of the Notice of Removal, together with a copy of all process, pleadings, and orders served upon Everlaw in the State Court action (and attached hereto as Exhibit 1) on counsel for the Plaintiff and for filing of a copy of the Notice of Removal in the State Court Action in accordance with 28 U.S.C. § 1446(d), to be completed promptly after the filing of this Notice of Removal.

**WHEREFORE**, Everlaw hereby notifies this Court, Plaintiff, and the Supreme Court for the State of New York, County of New York that the above-captioned matter, now pending in the Supreme Court for the State of New York, County of New York, under Index No. 652875/2026, is hereby removed to this Court.

Dated: June 9, 2026

**FISHER & PHILLIPS LLP**

By:  _____
David B. Lichtenberg
Madeline B. Gayle
For FISHER & PHILLIPS LLP
400 Connell Drive, Suite 4000
Berkeley Heights, New Jersey 07922

Times Square Tower
7 Times Square, Suite 4300
New York, NY 10036

Phone: (908) 516-1050
Fax: (908) 516-1051
dlichtenberg@fisherphillips.com
mgayle@fisherphillips.com

*Attorneys for Defendant Everlaw, Inc.*

# Exhibit 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------X

ANNA SCHNITTER,

                           Plaintiff,

            -against-

EVERLAW, INC.,

                         Defendant.

-------------------------------------------------------------X

Index No.:

Date Index No. Purchased:

## **SUMMONS**

**TO THE ABOVE-NAMED DEFENDANT:**

      **PLEASE TAKE NOTICE THAT YOU ARE HEREBY SUMMONED** to answer the Verified Complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

      Venue in New York County is proper pursuant to N.Y. CPLR § 503(a).

Dated:  Brooklyn, New York
        May 18, 2026

                       TRACHTMAN & POLER LAW LLC

                       By: *Laura M. Trachtman*
                         Laura M. Trachtman

                       45 Main Street, Suite 810
                       Brooklyn, New York 11201
                       (917) 300-8191
                       laura@trachtmanpoler.com

                       *Attorneys for Plaintiff*

NYSCEF DOC. NO. 1

Case 1:26-cv-04873  Document 1  Filed 06/09/26  Page 9 of 51

To: David Lichtenberg, Esq.
Madeline Gayle, Esq.
Fisher & Phillips LLP
400 Connell Drive Suite 4000
Berkeley Heights, New Jersey 07922

*Attorneys for Defendant*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| ANNA SCHNITTER, | | Index No. |
| --- | --- | --- |
| Plaintiff, | | **Verified Complaint** |
| -against- | | |
| EVERLAW, INC. | | |
| Defendant. | | |

ANNA SCHNITTER, by her attorneys, Trachtman and Poler Law LLC, by and for her Verified Complaint against Defendant, EVERLAW, INC. alleges as follows:

**Nature of the Action and The Parties**

1. This is an action for damages grounded in, *inter alia*, violations of Labor Law §§ 740, 215, 191-c and 191, breach of contract and in the alternative, unjust enrichment, breach of the duty of good faith and fair dealing, negligent supervision and negligent retention.

2. Plaintiff Anna Schnitter (hereinafter "Anna" or "Plaintiff") is a natural person and an employee of Everlaw Inc., as well as a resident of the State of New York; Plaintiff works for Everlaw, Inc. in the State of New York.

3. Everlaw, Inc. (hereinafter "Everlaw" or "Defendant") is a foreign business corporation duly registered to conduct business in New York State.

4. Everlaw is a cloud-based e-discovery platform that assists attorneys manage, review and analyze electronic data.

**Jurisdiction and Venue**

5. Venue is based upon Defendant's offices located at 530 Fifth Avenue, New York, New York, 10036.

6. Jurisdiction is based upon the Everlaw Fiscal Year 2026 Sales Incentive Plan (hereinafter the "Commission Contract"), which agreement was executed by both parties on May

1

15, 2025, memorialized that "[i]f you are employed in the U.S, this Plan will be governed by the laws of the state in which you work for Everlaw."

## Pertinent Non-Parties

7. Dustin Stuflick is a natural person, a Director of Sales employed by Everlaw and the manager of the Plaintiffs Team; the Plaintiffs Team is a division of Everlaw which sells products to law firms that represent plaintiffs in lawsuits.

8. Tera Piserchio is a natural person, an Account Executive employed by Everlaw and Plaintiff's former teammate on the Plaintiffs Team.

9. Matt Adams is a natural person, an Account Executive employed by Everlaw and Plaintiff's former teammate on the Plaintiffs Team.

10. John Rauch is a natural person, an Account Executive employed by Everlaw and Plaintiff's former teammate on the Plaintiffs Team.

11. Joe Glass is a natural person and the Chief Revenue Officer employed by Everlaw.

12. Kyle Parrish is a natural person and the Vice President of Sales for North America employed by Everlaw.

13. Tyler Haugen is a natural person and a Senior People Partner employed by Everlaw.

14. Russell Vickers is a natural person and the Associate General Counsel for Everlaw.

15. Sophia Khan is a natural person and a Customer Success Manager employed by Everlaw.

2

## Facts

16.      On or about June 9, 2018, Plaintiff commenced working at Everlaw as a Sales Development Representative (hereinafter, "SDR").

17.      Plaintiff performed very well as an employee of Everlaw.

18.      During her first year of employment as a SDR, Plaintiff was ranked #1 in meetings booked for nine consecutive months, was promoted twice before becoming an Account Executive in August 2019, and was awarded Most Valuable SDR at Sales Kick Off in 2019.

19.      For Everlaw's fiscal year 2022, Plaintiff received the President's Club award, achieving sales approximating 184% of her annual quota.

20.      In February 2022, Plaintiff was again promoted, this time to an Enterprise Account Representative.

21.      Plaintiff achieved her annual quota in the first half of Everlaw's fiscal year 2023, and finished the year with 172% of her sales quota.

22.      For Everlaw's fiscal year 2024, Plaintiff achieved ~115% of her annual sales quota and 137% of new business quota.

23.      Similarly, for Everlaw's fiscal year 2026, Plaintiff was on track to hit quota in October and to end the year having earned sales credit well over 100% of her quota.

24.      Before she was put on leave in October 2025, Plaintiff had closed ~$1,000,000 of her $1,370,000 quota, and she eventually exceeded her sales quota for fiscal year 2026.

<u>Working on the Plaintiffs Team</u>

25.      On or about February 1, 2024, Plaintiff left her previous team and began working on the Plaintiffs Team, where Dustin Stuflick (hereinafter "Dustin") was the team manager as well as Director of Sales.

3

26. In or about March or April 2024, Dustin conceived of a scheme to earn new sales credit and commission, which he relayed to, *inter alia*, Plaintiff.

27. This concept involved Dustin and his team members rewriting contracts for cases already hosted on Everlaw's servers by offering more favorable terms to the clients, and then changing the case name so the team members would be able to rebrand the contract as a new sale.

28. Team members would thus receive both a commission for the "new" sale and additional credit towards their sales quota[1].

29. This scheme involved not only the Plaintiffs Team but also Everlaw employees in the Customer Success Team (hereinafter, "CS").

30. If the scheme was successful, then the members of the Sales Operations Team (hereinafter, "Sales Ops") would not notice, and the Plaintiffs Team would boost their bookings and commissions.

31. To justify this obvious scheme to defraud, Dustin pointed out to Plaintiff that Sales Ops make a number of mistakes each month with commissions, and his plan would help offset their financial loss stemming from those mistakes.

32. Dustin also specifically told Plaintiff not to mention the scheme to anyone on other teams; his desire to keep the scheme a secret is indicia that Dustin knew that this scheme was unethical.

<u>Manifestation of the Scheme to Defraud</u>

33. A perfect example of how the scheme operated is as follows: On or about June 11, 2024, Tera Piserchio (hereinafter, "Tera"), another member of the Plaintiffs Team, reached out to

---

[1] Credit towards quota was vital to a salesperson's commission structure, as Plaintiffs Team members' commissions increased from 8% to 20% once they satisfied their sales quota.

4

Case 1:26-cv-04873   Document 1   Filed 06/09/26   Page 14 of 51

a client to discuss reducing rates for a case which had been hosted on Everlaw's servers since July 2021.

34.     She met with the client, agreed on a new rate, issued a new order form instead of an amendment for the older case at the lower rate, and changed the case name.

35.     Tera then listed the "new case" in the win notification, received credit towards her sales quota, and received a new commission from the "sale."

36.     The appropriate action to take if offering an existing case a new rate would be to file an amended order form memorializing the new rate; this would provide a salesperson with neither credit towards their sales quota nor a commission.

37.     This is why the activities at issue herein constitute fraudulent activity, because the combination of the case transfer, the new case name, the new case order form, the win notification and approval notes somehow served to trick Everlaw's system and the Sales Operations Team into believing that the amendment was a new case when it was not.

38.     It is extremely telling that, since Plaintiff first complained about this gross misconduct, Everlaw now requires that a salesperson confirm that the case is not transferred when logging a new case into the database, which serves to prevent this type of fraud from recurring.

39.     On or about June 17, 2024, Tera offered lower pricing to a client for two cases that encompassed the majority of the data hosted by Everlaw while also re-negotiating their MSA contract.

40.     New order forms were issued, and Tera informed the client to ignore the database set up links that are automatically sent out for new cases; instead, she changed the names of the databases on the new Order Form and in Salesforce.

5

41.    Tera then listed both as new cases on the win notification[2], and earned additional sales credit towards her quota as well as commission payments.

42.    On or about July 26, 2024, another member of the Plaintiffs Team, Matt Adams (hereinafter "Matt") reached out to the attorneys at one of his clients and set up a call with the client, himself, and Dustin to discuss the rates for the cases already hosted by Everlaw.

43.    During the call, Dustin informed the client that he asked Matt to reach out because they wanted to offer a discount on the cases.

44.    After the call, Matt issued two new order forms for the client's cases, noted that they were new cases, and listed both "new cases" in the win notification.

45.    The cases were later transferred for sales credit towards Matt's quota, and earned Matt additional commission payments.

46.    In or around August 2024, Plaintiff had a one on one (hereinafter "1 on 1") meeting with Dustin.

47.    Previously, on or about August 20, 2024, at a dinner event for the team, Matt mentioned that their job was easy, just rewriting contracts and wrapping up work at 3pm.

48.    Plaintiff told Dustin that Matt's comment upset her at the dinner and again during their next 1 on 1.

49.    Dustin told Plaintiff that the team deserved the sales credit because of all they do for the accounts, and further suggested that Plaintiff also participate in rewriting contracts.

50.    On or about September 20, 2024, John Rauch (hereinafter, "John") rewrote one of his client's cases noting that it was "a new antitrust case", "new antitrust prod" and listing it as a new case on the win notification.

51.    Similarly to Matt and Tera, John also received sales credit towards his quota and

---

[2] The "win notification" is a notification sent to everyone at the company as an alert as to new business.

commission payments.

52.    On or about October 2, 2024, Plaintiff confided to Dustin during one of their weekly 1 on 1 meetings that all of her deals seemed to be taking a long time to wrap up.

53.    He suggested that she simply rewrite the largest cases in her territory and, after the 1 on 1, sent her a report misleadingly entitled "Plaintiff Billing Alignment" with the largest cases across the team for her to target for rewriting.

### Unprofessional Conduct Exhibited by Plaintiff's Teammates

54.    On or about October 8, 2024, Plaintiff attended a conference with John, where Plaintiff took all of the client meetings for her team, and additionally met with one of Matt's clients in order to facilitate further business development on Matt's behalf.

55.    Thereafter, Plaintiff shared notes and tips from the client meeting, but Matt, who did not attend the event, declined to follow up with his client.

56.    Matt's actions (or lack thereof) prevented Everlaw from developing new leads for new cases.

57.    Similarly, instead of trying to network and meet clients as was the purpose of attending the event, John chose to go to a casino, effectively ignoring all of his work responsibilities.

58.    In fact, John actually told Plaintiff that he chose to go to a casino where he would not run into clients, which served to defeat the entire point of John attending the conference.

59.    In or about December, 2024, Tera and Plaintiff scheduled a presentation on the same day as Everlaw's New York City holiday party.

60.    Plaintiff skipped the holiday party to attend the presentation, but about 5-10 minutes before the presentation (which Tera was to lead) was scheduled to commence, Tera told

7

Plaintiff that she wouldn't be able to lead the presentation after all because she was having her hair done at a salon and her treatment wasn't done.

61. Tera then clarified that she wouldn't be able to join until halfway through the call.

62. There is no doubt that Tera knew more than 5-10 minutes before the meeting that her hair appointment would not conclude before the presentation was scheduled to begin, and Plaintiff was upset that Tera put her hair appointment before the deal they were both working on, and also put Plaintiff in the awkward position of leading a call that she was not prepared to lead.

63. In part based on the behavior exhibited by her teammates, early in 2025, Plaintiff mentioned to Dustin that rewriting contracts didn't incentivize the best behavior, and that Plaintiff was struggling in an environment wherein she was the only one the team not rewriting contracts.

64. Dustin's response was that due to the new contracting system, Q2C, he wasn't sure if they would be able to continue to rewrite contracts for sales credit.

65. Unfortunately, Dustin's assessment was inaccurate, and the team was still able to rewrite contracts until, eventually, Plaintiff complained to HR and Everlaw changed the system.

<u>Plaintiff Punished For Not Defrauding Everlaw</u>

66. On or about January 29, 2025, during Plaintiff's 1 on 1 with Dustin, he told her that Tera and John were getting promoted to Senior Enterprise Account Executives.

67. Dustin assured Plaintiff that he had also requested Plaintiff's promotion, but Joe Glass (hereinafter "Joe") and Kyle Parrish (hereinafter "Kyle") said that, despite doing a good job the past year, they could not promote her because Plaintiff had not met her sales quota.

68. Dustin insisted he made the argument that Plaintiff had made significant valuable contributions with event planning and travel but confided that Joe and Kyle said it would be a

8

bad precedent to promote someone who had not met their quota.

69. Additionally, Matt was admitted to the President's Club, wherein afterwards, he received a free trip to Panama because he "exceeded" his sales quotas.

70. Without fraudulently rewriting contracts, Matt would not have qualified for the Club as noted in Captivate IQ in April 2026; he only achieved approximately 60% of his sales quota through legitimate deals, one of the lowest rates on the entire team.

71. It is also worth noting that Matt did not hit quota for Everlaw's fiscal year 2026, but based on previous metrics, if he had continued to rewrite fraudulent contracts he most likely would have.

<u>Communications Guidelines for the Plaintiffs Team</u>

72. On or about February 7, 2025, Dustin sent the team an email concerning communication guidelines.

73. This email was sent in part regarding Plaintiff confronting Tera about a number of Tera's recent passive aggressive actions, such as trying to get other team members involved in the Plaintiff's deals to reduce Plaintiff's bookings.

74. As a result, Dustin wrote in the communication guidelines, "Focus on your book of business and your own actions. If you have a concern regarding another employee's actions in their book of business or in a joint/split opportunity, please reach out to your manager and inform them of the concern before taking further action."

<u>Lost Deals Due to Lack of Incentive to Sign New Deals by Plaintiffs Team</u>

75. On or about February 25, 2025, Plaintiff received an update from a client, that co-counsel would be making a decision shortly on which vendor to hire for their new case; she shared this information immediately with Dustin and Matt.

9

76.     Even though Matt assured Plaintiff that he would follow up with his client, he only made one or two calls and did not send a single email, and as a result, Everlaw lost a deal worth approximately one hundred sixty two thousand ($162,000) dollars (the "February Deal").

77.     At the end of March 2025, several events occurred concerning deals.

78.     First, Plaintiff alerted Dustin that they lost the February Deal because Matt failed to follow up as he said he would.

79.     It is important to note that, shortly after losing the February Deal, Matt attempted to rewrite a contract for another client.

80.     Instead of focusing on bringing in new business for Everlaw, Matt was clearly comfortable with rewriting fraudulent contracts to hit his sales quota.

81.     Second, Plaintiff and Matt won another deal which brought in one hundred and twenty thousand ($120,000) dollars in sales to Everlaw, and Dustin decided that they would split the deal 50-50, although Plaintiff did the lion's share of the work and Matt failed to do what he was supposed to do on multiple occasions.

82.     For example, Matt said he would reach out to the attorney from his account who was the Economic Buyer and signer but he never did; when Plaintiff brought up (on multiple occasions) Matt's failure to expend energy to close new deals with Dustin, Dustin acknowledged that he shared Plaintiff's assessment.

83.     In the end, every aspect concerning the negotiating and closure of the deal was run through Plaintiff's client.

84.     When Plaintiff raised her concerns about inequality of the split to Dustin, he dismissed her, saying that she should not be concerned about losing a small portion of a split.

85.     It is important to note that the booking difference between Plaintiff's portion and

10

Matt's portion was thirty thousand ($30,000) dollars, which would have been six thousand ($6,000) dollars in commission.

86. Dustin also mentioned that Plaintiff did not need to be stressed out because she had "gotten after it" and that leadership liked and respected her.

87. Third, the team lost another deal worth one hundred forty thousand ($140,000) dollars (the "March Deal").

88. It is important to note that Plaintiff's client let her know that the team would be making a decision as to which vendor to hire, and Plaintiff messaged Dustin to discuss the March Deal but he ignored her.

<u>Another Old Deal Rewritten to Appear New</u>

89. On or about April 11, 2025, a client reached out to John and Dustin about the growing size of the database and asked if Everlaw could lower the pricing to align with the increased size.

90. John offered a lower rate and issued a new order form instead of an amendment to the original order form.

91. When he closed the opportunity on April 17, 2025 he listed in the win notifications as the client "adding a case."

92. John received both sales credit towards his quota and a commission.

<u>Events Leading Up to Plaintiff Making a Complaint to HR</u>

93. On or about April 23, 2025, Plaintiff met with Kyle and expressed her concern that the Plaintiffs Team was not making a concerted effort to win the deals that they should, and specifically mentioned that the team had recently lost two deals, the February Deal and the March Deal.

11

94.    Kyle said that was unacceptable and asked Plaintiff to let him know if this continued.

95.    Plaintiff also mentioned that she felt that the splits amongst the Plaintiff Team were not equitable, and that if a person does more work on a deal, that person should receive a larger benefit; Kyle agreed with Plaintiff's assertion.

96.    After the meeting, Dustin became increasingly hostile towards Plaintiff, no doubt because, among other reasons, Kyle told Dustin about Plaintiff's concerns, and Dustin was both concerned about Plaintiff shining light on the fraudulent activity throughout the Plaintiffs Team and upset that Plaintiff mentioned to Kyle the Plaintiffs Team's lack of effort on closing potential deals.

97.    This hostility manifested, in part, on April 24 and 29, 2025, when Dustin cancelled the focal review scheduled with Plaintiff, claiming that Lattice (the review website) was down; when Plaintiff checked to see whether Lattice had been operating on each of those two days, she was surprised to learn that Lattice was operating normally and fully functional on both days.

98.    On April 29, 2025, Plaintiff spoke with a former member of Dustin's team to ask his advice as to whether she should report the fraud.

99.    On or about May 14, 2025, Dustin reviewed with Plaintiff her progress on the communication guidelines that he had shared with the Plaintiff Team on February 7; his feedback was that Plaintiff had done a good job implementing the feedback and directions, even mentioning that Plaintiff made significantly more progress than another teammate had over the last few months.

100.    However, when Dustin memorialized the feedback via email the following day

12

(which was May 15), the feedback he gave was drastically different from what had previously been discussed.

101. The reason for why Dustin's feedback via email was so different from his feedback during the meeting later became clear.

102. On or about May 13, 2025, that former member of Dustin's team (from whom Plaintiff had sought advice on April 29, 2025) attended an event with a member of the Plaintiffs Team, and upon information and belief, that former team member told the current team member about his conversation wherein Plaintiff confessed she was thinking of reporting the fraudulent contract rewriting to Everlaw' leadership and that this information got back to Dustin.

103. It is clear that Dustin learned about this conversation because the email Dustin sent recapping his meeting with Plaintiff differed so dramatically from what had actually been discussed in the meeting.

104. When Plaintiff responded to Dustin stating that the feedback provided over email was different than what had been discussed and asked for clarification and examples, Dustin invented instances which contradicted the guidelines he had previously set.

105. In other words, Dustin adjusted the guidelines in real time to ensure that Plaintiff's conduct, and only Plaintiff's conduct, did not meet his newly memorialized guidelines.

106. It should also be noted during the initial meeting Dustin had mentioned that someone at another vendor had reached out about Plaintiff drinking too much alcohol at a recent evening event but he informed Plaintiff that he "did not want to pursue things there."

107. He later changed this perspective after Plaintiff made the initial complaint with Megan Porter (hereinafter "Megan"), an Associate People Partner at Everlaw's human resources department.

13

## Plaintiff Complained to HR About the Plaintiffs Team Fraudulently Rewriting Contracts

108. On or about May 16, 2025, Plaintiff reached out to Megan for an initial discussion of Dustin's inappropriately close relationship with Tera.

109. On or about May 21, 2025, Plaintiff followed up with Megan to reference Dustin's questionable conduct, but Plaintiff was not sure she was ready to disclose it.

110. On or about May 22, 2025, Plaintiff messaged Megan to report her team's fraudulent activities.

## Retaliation vis-a-vis Conference Attendance

111. Plaintiff also connected with Dustin about conference attendance.

112. The previous week, Plaintiff and Dustin had discussed attendance for upcoming conferences.

113. Going to conferences was a benefit for Account Executives as it was an opportunity to meet with clients in-person, and Plaintiff enjoyed attending conferences, which Dustin was well aware of.

114. Dustin recommended that Plaintiff attend the upcoming conferences in lieu of Tera, because Tera was not able to control her emotions and he was worried Tera would "do something at the conference that would force him to fire Tera."

115. This was reiterated on May 22, when Dustin said he did not want to punish Plaintiff for Tera's behavior by limiting Plaintiff's attendance at conferences.

## Post-Complaint Retaliation

116. However, after Plaintiff complained to HR about, among other things, the Plaintiffs Team fraudulently rewriting contracts for commissions and quota, Dustin changed his mind.

14

117. In an obvious act of retaliation, Dustin took Plaintiff off an upcoming conference and sent Tera and Matt instead.

118. Before reporting the fraud, Plaintiff was scheduled to attend the upcoming conference and had been working with Marketing and an Everlaw Partner to plan a client event at that conference.

119. Despite Dustin's concerns that Tera was unable to regulate her emotions and would act in a manner that would force him to fire her, Dustin sent Tera to the next four conferences.

120. Plaintiff was permitted to attend only one conference because Tera was on vacation the week that the conference was held, whereas previously Plaintiff had consistently attended multiple conferences due to her strong performance and networking ability.

121. On or about June 2, 2025, Dustin called the Plaintiffs Team together for a meeting and started the meeting by saying, "If you are not doing well, maybe you should walk across the street and get another job."

122. On or about June 5 or June 6, 2025, while Plaintiff was attempting to finalize a deal with their partner, Dustin cut her out of communications entirely, which made Plaintiff's job much harder to perform and also created a hostile work environment.

123. This was another act of retaliation for reporting Dustin and the team's illegal activities.

124. On or about June 6, 2025, Tyler Haugen (hereinafter "Tyler"), who works in Everlaw's Human Resources department, messaged Plaintiff mentioning he had a few items he needed to discuss.

125. During the call, Tyler shared there was a complaint that Plaintiff messaged a

15

client ("Client M") too late in the evening[3] about the February Deal and that Plaintiff drank too much at a recent event.

126. Plaintiff expressed that this complaint felt very retaliatory, that Tera has a personal relationship with the client and confided her suspicion that Client M's complaint had been instigated by Tera.

127. Plaintiff explained to Tyler and Russell that there was no factual basis for this complaint, as the events grounding Client M's complaint had occurred back in March and said complaint was lodged end of May or early June, which was not only several months after the event occurred but after Plaintiff complained about her team defrauding Everlaw.

128. By way of background on Tera and Client M, in or around September 2024, Plaintiff and Tera attended a conference.

129. During the conference they went to dinner with, *inter alia*, an attorney who worked for Tera's client.

130. After the dinner, the group went to a bar for after-dinner drinks.

131. While at the bar, Tera told everyone she was going out to smoke a cigarette but instead ditched her client and Plaintiff to meet up with Client M.

132. Client M works for Plaintiff's client, so there was no legitimate business reason for Tera to have met with Plaintiff's client without Plaintiff also being present.

133. Plaintiff only found out later that Tera had left the bar to go meet up with Client M when an hour had passed and Plaintiff texted Tera to check in on her.

134. Tera later texted Plaintiff that she regretted not making a move to "hook up" with Client M.

---

[3] At the time this occurred, Plaintiff was traveling on another continent and neglected to account for the difference in time zones when messaging Client M. When this was brought to her attention, Plaintiff apologized, the apology was accepted, and Client M continued to text with Plaintiff as usual.

16

135. A few weeks later, Tera pushed heavily to have Client M speak at an Everlaw conference.

136. Tyler acknowledged that the timing of the complaint was suspicious and indicated that he would check-in with Russell Vickers, Esq. (hereinafter "Russell") on the sales credit investigation.

137. Plaintiff also voiced concerns over Kyle's close relationship with Dustin.

138. Tyler confirmed that Kyle and Dustin were close but said he thought Kyle would do the right thing; as demonstrated below, this did not bear out.

139. Plaintiff mentioned to Tyler that Tera had previously shared a story wherein, before the Plaintiffs Team was created, she, Tera, attended a conference in Vegas and she went out, met a guy and stayed up so late that she did not make it to her booth shift the next morning (she was supposed to work the booth with a member of the CS team, Sophia Khan).

140. Dustin covered for her and told Sophia to not make it a big deal.

<u>Plaintiff Alerted the Chief Revenue Officer to the Fraud</u>

141. On or about June 19, 2025, Plaintiff emailed Joe her reflections on the Plaintiffs Team culture, wherein she stated in sum and substance that previous sales leadership had always encouraged doing the right thing for the business and clients without sacrificing sales integrity, but Dustin was more focused on rewriting contracts than on trying to win meaningful deals for the business.

142. When Plaintiff sought advice on closing deals faster, Dustin's advice was to rewrite contracts.

143. Plaintiff hoped that Everlaw would not overlook the wrongdoing of her team and would rebuild the team with values that aligned with those of their company and their clients.

17

144. On or about June 20, 2025, Joe acknowledged Plaintiff's email.

145. On or about June 23, 2025, Plaintiff emailed Joe an example of the sales fraud, wherein her team members rewrote contracts with existing clients in order to earn additional commissions and credit towards their sales quotas.

146. Joe responded to ask Plaintiff not to investigate the matter herself and mentioned that Everlaw's Legal Department (hereinafter, "Legal") was looking into the issue.

147. Joe then referred Plaintiff to Russell for further inquiries.

<u>Additional Instances of Retaliation for Complaining</u>

148. On or about June 30, 2025, Plaintiff wrote to Tyler from HR and Russell from Legal to complain that Dustin had retaliated against her for complaining about the sales fraud.

149. Specifically, Plaintiff complained that Dustin had excluded her from communications about deals in which her clients were involved, and Dustin had revoked her previously approved attendance for an upcoming conference

150. On July 2, 2025, Tyler replied to inquire as to whether she would consent to him addressing her concerns directly with Dustin.

151. On July 7, 2025, Tyler followed up, and while Plaintiff consented to her concerns being addressed directly with Dustin, she also requested that, in light of Dustin retaliating against her, she be assigned to a new supervisor.

152. Plaintiff also shared additional information concerning the retaliation vis-a-vis the conference.

153. On July 9, 2025, Tyler informed her that her retaliation claims were being investigated but denied her request to report to a different supervisor.

154. Shortly thereafter, members of the Plaintiffs Team, including but not limited to

18

Tera, began making comments either implying or plainly stating that Plaintiff was a liar.

155. As Plaintiff was the only one on the team not to defraud Everlaw by drawing up falsified contracts and transferring for sales credit, this was an incredibly ironic, as well as slanderous, development.

156. On or about July 10, 2025, Plaintiff emailed Tyler and Russell to inquire as to whether Everlaw supported Dustin's retaliatory action in removing from her the upcoming conference.

157. That same day, Tyler replied to state that, while Everlaw supported Dustin's decision re: AAJ, the circumstances leading to that decision were being examined for retaliatory animus.

158. On or about July 14, 2025, Plaintiff's LinkedIn and Facebook accounts were hacked into; this occurred approximately one week after Tyler initially discussed Plaintiff's complaints with Dustin.

159. On or about July 15, 2025, Plaintiff asked Tyler and Russell for guidance on how to field questions from her clients concerning her absence from the upcoming conference, and to explain how negatively impactful the past few months have been since she made her complaint about the sales fraud being perpetuated by members of her team.

160. Plaintiff also shared additional information memorializing that the alleged reasoning behind Dustin's decision to substitute out Plaintiff for another teammate at the upcoming conference was mere pretext for retaliation.

161. On or about July 16, 2025, Plaintiff set up a meeting with Tyler wherein they discussed Tyler's investigation into Dustin's repeated cancellation of Plaintiff's focal review as well as Plaintiff being excluded from team communications after she complained about the

19

fraudulent contract rewriting.

162. On or about July 24, 2025, Plaintiff emailed Tyler to alert him to an issue regarding a contract she was working on and expressed her concern that it would be used to retaliate against her.

163. Tyler replied to ask if she had raised the issue with Kyle or anyone else, and Plaintiff replied that she was waiting for additional information.

164. Eventually, this issue died away, but it is a mark of Plaintiff's anxiety and dread that she felt she had to flag a normal workplace occurrence for her protection.

165. On or about July 28, 2025, Plaintiff emailed Tyler and Russell about a colleague blocking her on social media; this person was the same Customer Success employee who was responsible for transferring cases to make them look like they were new cases, Sophia Khan, the same individual who had been cowed by Dustin to let Tera's previous bad behavior slide by.

166. Tyler replied to state that Everlaw employees have the right to operate their social media accounts as they see fit, but that Everlaw was taking every needed precaution to protect the integrity of the investigation, including reminding relevant parties about Everlaw's anti-retaliation policies.

167. On or around July 29, 2025, Everlaw lost a deal to a competitor, as the client wanted a specific structure for the contract.

168. Plaintiff had repeatedly shared this information regarding the specific structure with Tera and Dustin, and Tera said she would follow up with her client who was co-counsel; however, Tera failed to either follow up or to accurately inform her client that the specific structure they wanted was available through Everlaw.

169. Additionally, and throughout the deal, Plaintiff consistently shared information

20

with Tera, but Tera failed to reciprocate, sharing neither updates nor information from her end.

170.    Tera made several mistakes around the pricing and left many parts of the RFP incomplete and, most importantly, did not share the final RFP with Plaintiff.

171.    Accordingly, Plaintiff was unable to proofread the RFP, which, as submitted by Tera, was sloppy and incomplete.

172.    It was clear to Plaintiff and others that Tera's RFP was not prepared in a manner intended to win the deal.

### Everlaw Failed to Substantiate Plaintiff's Complaints

173.    On or about July 30, 2025, Russell met with Plaintiff and shared that Everlaw declined to substantiate either the fraud or the retaliation complaints against Dustin and the team.

174.    He mentioned that, *inter alia*, the retaliation complaint had been unsubstantiated as the timing was not suggestive of retaliation, and that the fraud claims were unsubstantiated as they were unable to confirm that the Plaintiffs Team members were intentionally stealing the sales credit by rewriting old contracts as new.

175.    However, Everlaw now requires their sales personnel to record whether the case was transferred or not; this indicates that the Plaintiffs Team was not punished for actions that Everlaw now actively seeks to prevent.

176.    On or about August 8, 2025, Plaintiff emailed Tyler and Russell to provide additional context demonstrating that the sales credit fraud was premeditated in the hopes that the internal decision would be reconsidered, and also to inquire as to whether text messages had been collected from her work colleagues.

177.    Plaintiff also shared insight into Dustin's deceitful activities, which included him lying about the program Lattice being down and using that to postpone Plaintiff's focal review

21

twice.

178. Plaintiff finally inquired as to whether any additional complaints had been made against her since she made the initial complaint with HR about her team's fraudulent activities.

179. On or about August 12, 2025, Tyler acknowledged the email.

<u>Additional Instances of Retaliation</u>

180. On or about August 13, 2025, Plaintiff shared with Tyler an additional instance of Dustin retaliating against her by being slow to respond to her inquiry about pricing for a deal.

181. On or about August 14, 2025, Tyler reached out to discuss, but Plaintiff was out of the office that day.

182. Tyler and Plaintiff met on or about August 19, 2025, and Tyler told Plaintiff that Dustin being slow to respond to a pricing inquiry was not retaliation, but a conflict issue.

183. This is clearly a pretextual absolution for Dustin retaliating against Plaintiff yet again by creating a hostile work environment and making it more difficult for Plaintiff to do her job.

184. On or about August 20, 2025, Plaintiff emailed Tyler to inform him that Dustin did not give her the assistance he had given other members of her team to get pricing approved on similar deals, thereby demonstrating that Dustin treated Plaintiff in a disparate manner in retaliation for reporting his actions to HR.

185. On or about that same day, Tyler acknowledged the email.

186. On or about August 25, 2025, Tyler emailed Plaintiff to inform her that not all tense interactions with one's manager rise to the level of retaliation.

187. When Plaintiff replied to ask what actions had been taken to ensure that she is supported at work and able to perform her job, Tyler replied that her concerns have been

22

addressed with Dustin and Kyle and both have committed to resolving any issues with Plaintiff.

188. In light of Plaintiff's complaints, this is another example of Dustin's mendaciousness.

189. The following day, Plaintiff replied to Tyler's email to point out that Dustin had prepared everyone on her team except for her for their Quarterly Business Review (hereinafter "QBR"), and that Dustin had made traveling for her QBR difficult, therefore demonstrating that any anti-retaliation commitment that Dustin made was lip service only.

190. On August 27, 2025, Tyler acknowledged Plaintiff's email.

191. On or about September 2, 2025, Tyler stated that sales enablement selected the QBR date, that the travel had been addressed to accommodate Plaintiff's schedule, and that she had not been included in QBR prep because she had been out of the office when Dustin was doing QBR prep.

192. Plaintiff pointed out that Dustin had actually reached out to her that same day she was out of the office so that was clearly inaccurate.

193. She further pointed out that on previous occasions, Dustin had encouraged Plaintiff to attend her QBR in person, but this time, he had suggested that she attend remotely.

194. During her QBR, Plaintiff presented how her last quarter had gone and projected how the next quarter would go.

195. During her previous quarter, Plaintiff hit 181% of her new business quota and 114% of her existing business quota.

196. Despite Plaintiff's outstanding performance, Dustin and Kyle pressed Plaintiff hard throughout her entire presentation, more so than anyone else on the Plaintiffs Team, despite Plaintiff's outstanding quarter.

23

197. A colleague who sat in on Plaintiff's QBR mentioned to her afterwards that they were surprised at how many questions Dustin and Kyle had asked Plaintiff during her QBR.

198. On or about September 4, 2025, Plaintiff attended a conference.

199. Afterwards she shared comprehensive notes from the sessions and networking with the team.

200. On or about September 8, 2025, Dustin ignored Plaintiff's outreach when she needed to discuss a deal and respond quickly to the client; Dustin's calendar reflected that Dustin was not in any meetings during that timeframe and thus should have been able to reply with greater alacrity.

201. This cold shouldering of Plaintiff's work created a hostile work environment and made Plaintiff's job more difficult to perform.

202. On or about September 15, 2025, Dustin accused Plaintiff of not following directions regarding contracting for a specific account related to a litigation involving a large deal, despite Plaintiff following the directions agreed upon during their previous 1 on 1 meeting.

203. The following day, Plaintiff was so overwhelmed with anxiety and emotionally drained from being constantly subjected to retaliation that she took a day off from work, and emailed Tyler to alert him that she was continuing to suffer retaliation.

204. On or about September 17, 2025, Dustin asked Plaintiff the same question over and over again, inquiring into how she saw a message about a specific deal.

205. When Plaintiff told Dustin his behavior was making her uncomfortable and asked him to stop, he canceled their scheduled 1 on 1 meeting.

206. It is noteworthy that repeating the same question over and over again is well-documented abusive behavior utilized by narcissists to exercise control over others.

24

207. Unsurprisingly, Plaintiff took a week off from work due to her mounting anxiety and was out of the office from September 22-26, 2025.

208. On or about September 30, 2025, Kyle had an unscheduled performance review with Plaintiff, wherein Kyle used inaccurate information as a platform to ground his allegation that Plaintiff was experiencing performance issues.

209. Kyle claimed Plaintiff was not aligned with the business and, as an example, alleged that Plaintiff had pushed back on a pricing decision she was told by Dustin not to pursue.

210. In reality, Dustin had encouraged Plaintiff to pursue the pricing and to try to get Kyle on board with the decision.

211. Kyle also stated that if Plaintiff was no longer happy at Everlaw, they would be happy to offer her a severance package.

212. As this conversation occurred exactly two months after Everlaw failed to substantiate Plaintiff's complaint about her teammates defrauding the company, there is no doubt that Kyle's suggestion that Plaintiff separate employment with the company was retaliatory in nature.

213. Another example of how Kyle retaliated is that at the end of March 2025, Dustin told Plaintiff that leadership liked and respected her, but after Plaintiff complained, Kyle told her she was not a good fit for the company.

214. On or about October 2, 2025, Plaintiff raised questions about the veracity of Kyle's claims concerning her performance issues by challenging the truth of what Kyle alleged formed the basis for Plaintiff's so-called "performance issues."

215. Kyle failed to reply substantively to her questions.

216. The fact that Plaintiff challenged the truth of Kyle's allegations and he refused to

25

discuss whether they were true but continued to use his misstatements of fact to form the basis for the alleged need for Plaintiff to be placed on a performance management plan is bad faith and unfair dealing on Everlaw's part.

217. On or about October 3, 2025, Kyle emailed Plaintiff to inform her that she had to give a response to the ultimatum of being placed on a performance management plan or to separate employment from Everlaw.

218. On or about October 6, 2025, Plaintiff emailed Tyler and Russell to complain that Kyle had retaliated against her in alleging that she needed to be put on a performance management plan and that Kyle had been completely unprepared to discuss the specifics of why he felt she needed to be placed on a performance management plan, which was surprising for someone occupying the position of the Vice President of Sales for North America.

219. On or about October 7, 2025, in response to Plaintiff's insistence that she needed clarification on the issues concerning Kyle's factual inaccuracies, he replied: "To respond succinctly to your comment: 'Knowing whether or not you are still asking me to amend my behavior is critical to my decision making process' - the response is: Your 'Off Track' performance rating is final based on your mid-year review. We appreciate you taking the time to share your perspective, however, continuing to debate the specifics of the splits when there are so many other performance issues is no longer productive. Our focus is now on your future."

220. In other words, Kyle laid a foundation of lies to support his criticisms of Plaintiff's work performance, and when she continued to challenge him, he refused to engage.

221. Dustin later confirmed to Plaintiff that he had provided the inaccurate information upon which Kyle relied to allege that Plaintiff needed to be placed on a Performance Management Plan.

26

222. Plaintiff's bookings, as of September 2025, put her at 1.01 million ($1,010,000) dollars out of her approximately 1.37 million ($1,370,000) dollar quota; she was also set to book between one hundred and fifty to two hundred thousand ($150,000-$200,000) dollars in monthly recurring revenue and close two annuals valued at two hundred and fifty thousand ($250,000) dollars and twenty thousand ($20,000) dollars for October, therefore she was easily on track to not only make, but exceed her sales quota for the year, which further reinforces that Plaintiff did not need to be placed on a Performance Management Plan.

223. On or about October 8, 2025, Dustin made false claims that Plaintiff did not follow directions discussed regarding two RFPs she received.

224. He continued to insist she did not follow his directions despite Plaintiff executing the plan exactly as she and Dustin discussed.

<u>Everlaw Placed Plaintiff on Administrative Leave</u>

225. On or about October 16, 2025, eight (8) days after Everlaw became aware that Plaintiff had retained counsel, Plaintiff was put on leave following a "further complaint" based on undisclosed reasons, including the allegation that Plaintiff had spoken to individuals she was not permitted to speak to.

226. This "complaint" was made on or about October 9, 2025, which was after Plaintiff emailed Tyler and Russell to complain about Kyle's total inability to engage in dialogue about Plaintiff's alleged performance issues, and which allegations were grounded in bad faith.

227. It is important to note that the individual who made the complaint against Plaintiff is a friend of Dustin's, and Everlaw substantiated the complaint without ever interviewing Plaintiff concerning the allegations, which is another clear breach of Everlaw's duty of good faith and fair dealing.

27

Case 1:26-cv-04873   Document 1   Filed 06/09/26   Page 37 of 51

228.     As of the date of the filing of this document, Everlaw has still refused to share the details about which client the Plaintiff allegedly reached out to, upon information and belief, because Plaintiff could easily demonstrate that the complaint is totally without merit.

229.     Being placed on paid administrative leave without critical information as to the cause or any formal interview constitutes yet another retaliatory employment action, especially in light of the fact that any number of Plaintiff's colleagues have done exactly what Plaintiff is alleged to have done and suffered no adverse consequences at all, much less placed on leave.

230.     There is no doubt that Plaintiff has been the victim of almost constant retaliation since she informed Dustin early in 2025 that the defrauding scheme was wrong and the team should not engage in such wrongful conduct.

231.     Since Plaintiff made her complaint about Dustin and the team defrauding the company, she has become aware of two complaints against her; these are the first two complaints that HR has disclosed to Plaintiff since she joined the company in 2018 (in addition to the complaint which allegedly led to Everlaw placing Plaintiff on administrative leave).

232.     The fact that the first two complaints about Plaintiff were lodged only after Plaintiff complained, and within five months after she did so, suggests that they are, in fact, both related to her complaint and retaliatory.

233.     The incidents reported had each taken place more than two months prior to the dates that the complaints were lodged.

<u>Refusal to Disclose Commission Payments</u>

234.     During the meeting wherein Everlaw placed Plaintiff on administrative leave, Everlaw's representative assured Plaintiff that she would be paid commissions as she normally would during her period of leave, but not only did Everlaw not pay Plaintiff all of her

28

commissions during her leave, Everlaw refused to provide Plaintiff any statements of earnings paid or due and unpaid whatsoever for over six months.

235.    It is standard practice for Everlaw to share a report of bookings and commissions each month, but Plaintiff has not received a full and correct report of her bookings and commissions since September 2025.

236.    Plaintiff requested a statement of earnings paid or due and unpaid multiple times, including but not limited to the following dates: December 2, 12, and 16 (verbally, during a call between counsel for the parties), 2025; January 7, 28, February 4, 19, and March 20, 2026.

237.    This failure to provide clarity despite repeated requests is another instance of retaliation.

238.    Furthermore, on April 9, 2026 Tyler Haugen wrote to Plaintiff and stated in pertinent part that she would receive all commissions from her geographic area and book of business during her leave; to date, Everlaw has failed to add the booking and pay Plaintiff properly for her promised commissions, which has negatively impacted both Plaintiff's quota attainment and her income.

<u>Retaliation in Commission Allocation</u>

239.    Everlaw also retaliated against Plaintiff by allowing Dustin to deviate from normal practice in the allocation of commissions related to a large deal which closed in October 2025 (the "October Deal").

240.    As Plaintiff put together the contract, obtained approval for the challenging security provisions required by the other side, and negotiated the pricing, her commission should have reflected her leadership on the October Deal.

241.    Furthermore, Plaintiff's clients convinced the other firms to join the deal with

29

Everlaw.

242. Additionally, when a third party asked about the deal while Plaintiff was on leave, an employee of Everlaw told the third party that the person who had sold the deal was out on leave.

243. Had Dustin not deviated from normal practice, Plaintiff would have been allotted 50-75% of the commission.

244. Everlaw's established practice is to collect statements of work from everyone who worked on the deal after an account is signed to determine the commission split, but this was not done for the October Deal, marking a further deviation from standard procedure.

245. This is despite Defendant assuring Plaintiff that she would, in fact, be paid the following commissions: in an October 31, 2025, letter to Plaintiff's Counsel, Defendant stated in pertinent part: "Ms. Schnitter has continued to receive commission payments as normal. Ms. Schnitter is currently expected to receive whole or split commissions in respect of the following deals (assuming they close and commissions are entitled)" and proceeded to list 16 deals.

246. Out of those 12 deals that have closed, Plaintiff did not receive booking credit or commissions for 10, including three deals that closed the week after the plaintiff went on leave.

247. In December, Counsel for Plaintiff wrote to Counsel for Everlaw and stated in pertinent part:

> [M]y client closed two deals in October worth respectively $250k and $20k, and the payments she has received since do not reflect either of those commissions. Please provide a statement reflecting what commissions and MRR payments my client has received since being placed on leave, so that she can assess whether they are accurate. This is particularly important since her supervisor, Dustin, is tasked with apportioning commission percentages, and if he is continuing to retaliate against her by inappropriately lowering her commission percentage, that would constitute additional instances of retaliation. This would also derail her progress towards making her sales quota, which would not only cause Everlaw to pay my client less, but would make it easier for Everlaw to substantiate an

30

adverse employment action against her."

248. Plaintiff's lack of sufficient compensation for her work is underscored by additional instances of workplace retaliation at the hands of Everlaw.

### Rumors Spread By Her Former Teammates

249. On or about February 19, 2026, Plaintiff's counsel alerted Defendant's counsel that Plaintiff's former teammates were speaking ill of Plaintiff's professionalism and spreading a false narrative about why she was placed on leave.

250. Because Plaintiff failed to tell anyone at Everlaw why she was placed on leave in accordance with Everlaw's nondisclosure policy, this was the only narrative heard by her work colleagues.

251. Plaintiff alerted Everlaw on multiple occasions to the fact that her former teammates were spreading lies about her and damaging her good reputation.

252. To date, Everlaw failed to do anything more than put managers on notice that there should be no talk about Plaintiff or her leave of absence.

253. As a result, Plaintiff's teammates continued to spread false rumors about Plaintiff after she returned to work.

### Everlaw Brought Plaintiff Back to Work

254. On or about March 3, 2026, after Plaintiff was placed on paid administrative leave, she was informed that her reintegration back into the company would be through the Corporate Enterprise Team, an entirely new operation that Plaintiff is inexperienced with.

255. Furthermore, when Plaintiff returned to full-time work, she was **not** placed on a performance management plan despite Kyle's assertion mere months previously that Plaintiff had "so many other performance issues."

256. This is further indicia that Kyle's impromptu performance evaluation of the

31

Case 1:26-cv-04873   Document 1   Filed 06/09/26   Page 41 of 51

previous September, where he had stated that Plaintiff must either agree to a performance management plan or leave her employment with Defendant, was grounded in bad faith, unjust dealing, and retaliation.

257. Upon her return to work, Plaintiff was able to confirm that Plaintiff's former team said false negative things about her professionalism after she went on leave, and that they continued to do so after she returned to work.

258. Despite complaining to Defendant repeatedly about her former teammates spreading false rumors about her professionalism, Defendant took no action to stop the perpetuation of said rumors.

259. Furthermore, Plaintiff was not paid her commissions for February bookings which were due and owing on March 27, 2026, which constituted yet another instance of retaliation.

260. Plaintiff has asked for a report of her bookings and commissions since September 2025, but Everlaw refused to share Plaintiff's commission report until she returned to work and they could no longer hide the bookings.

261. It is noteworthy that it is Everlaw's standard practice to share such reports of commission and bookings with all Account Executives every month.

262. The reports from October 2025-January 2026, which Plaintiff received on April 21, 2026, and the reports for February and March 2026, which Plaintiff received on April 28, 2026, reflected that Everlaw failed to pay Plaintiff her commissions on approximately thirty (30) deals.

263. Plaintiff also complained to Everlaw repeatedly during her administrative leave about Everlaw's failure to pay her commissions that were due and owing in violation of the Labor Law, most recently on or about February 19, 2026, and Everlaw retaliated against her by

32

ending her administrative leave and bringing her back to work (in the hopes that Plaintiff would simply quit) and by revoking her remote position on March 3, 2026.

264. Removing Plaintiff's remote status without her consent or knowledge is yet another clear-cut example of retaliation, especially in light of the policy in Everlaw's handbook which memorializes that "if you were previously approved for remote work, your approval – and your signed remote work agreement – will remain valid and continue to apply, even with the current policy changes."

## AS AND FOR A FIRST CAUSE OF ACTION
### VIOLATION OF LABOR LAW § 740

265. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs with the same force and effect as if set forth at length herein.

266. Defendant's actions as described herein constitute unlawful retaliatory practices as defined in the New York Labor Law § 740.

267. As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff has suffered the indignity of harassment, the invasion of her rights to be free from harassment and great humiliation, and loss of income.

268. As a further and proximate result of these unlawful employment practices, Plaintiff has suffered mental anguish, outrage, anxiety about her future, damage to her good reputation, disruption of her personal life and loss of enjoyment of the ordinary pleasures of everyday life.

269. Furthermore, Defendant's failure to acknowledge some of Plaintiff's bookings (and the resulting failure to give her credit towards her quota or her commission payments) will impact her future promotion and job opportunities.

270. As a result of Defendant's violation of New York Labor Law § 740, Plaintiff has

33

been damaged in a sum to be determined at trial, but in excess of the jurisdictory minimums required by this Court.

271. Plaintiff also demands the attorney's fees incurred by her in this action.

## AS AND FOR A SECOND CAUSE OF ACTION
## BREACH OF CONTRACT

272. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs with the same force and effect as if set forth at length herein.

273. Defendant's actions as described herein constitute a breach of the Commission Contract, which was executed by both parties.

274. Plaintiff performed her obligations under the Commission Contract by bringing in new deals for which she should have received commission payments.

275. Defendant breached the Commission Contract by failing to pay Plaintiff her commission payments in violation of the Commission Contract.

276. As a result of Defendant's breach of contract, Plaintiff has been damaged in a sum to be determined at trial, but in excess of the jurisdictional minimums required by this Court.

## AS AND FOR A THIRD CAUSE OF ACTION
## UNJUST ENRICHMENT (IN THE ALTERNATIVE)

277. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs with the same force and effect as if set forth at length herein.

278. Defendant's actions as described herein constitute unjust enrichment, as Defendant's refusal to pay Plaintiff her earned and owing commissions enriched Defendant at Plaintiff's expense.

279. It is against equity and good conscience to allow Everlaw to retain these monies.

280. As a result of Defendant's conduct, Plaintiff has been damaged in an amount to be

34

determined at trial.

## AS AND FOR A FOURTH CAUSE OF ACTION
### VIOLATION OF LABOR LAW § 191-c

281.  Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs with the same force and effect as if set forth at length herein.

282.  Defendant's actions as described herein constitute a violation of the New York Labor Law § 191-c.

283.  As a result of Defendant's violation of the New York Labor Law § 191-c, Plaintiff has been damaged in a sum to be determined at trial, but in excess of the jurisdictional minimums required by this Court.

284.  Plaintiff demands the full unpaid commissions earned by her and unpaid to her by Defendant, as well as 100% liquidated damages, and 9% interest as provided for in the New York Labor Law § 198.

285.  Plaintiff also demands the attorney's fees incurred by her in this action.

## AS AND FOR A FIFTH CAUSE OF ACTION
### VIOLATION OF LABOR LAW § 191

286.  Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs with the same force and effect as if set forth at length herein.

287.  Defendant's actions as described herein constitute a violation of the New York Labor Law § 191, as Plaintiff repeatedly requested that Everlaw furnish her with a statement of earnings paid or due and unpaid, and Everlaw repeatedly failed to do so.

288.  As a result of Defendant's violation of the New York Labor Law § 191, Plaintiff has been damaged in a sum to be determined at trial.

35

## AND AS FOR A SIXTH CAUSE OF ACTION
## VIOLATION OF LABOR LAW § 215

289.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs with the same force and effect as if set forth at length herein.

290.    Defendant's actions as described herein constitute a violation of the New York Labor Law § 215, as Plaintiff complained that she was not receiving her commission payments or her statements of earnings, and Everlaw retaliated against her.

291.    Specifically, Defendant's decision to change Plaintiff's remote status to "in person" in violation of Everlaw's own written policy constitutes retaliation.

292.    As a result of Defendant's violation of the New York Labor Law § 215, Plaintiff has been damaged in a sum to be determined at trial.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## BREACH OF GOOD FAITH AND FAIR DEALING

293.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs with the same force and effect as if set forth at length herein.

294.    Defendant's actions as described herein constitute a breach of good faith and fair dealing implicit in Plaintiff's employment contract, as Defendant's course of conduct has been and continues to be taken in bad faith and unfair dealing against Plaintiff.

295.    One such example of Defendant's breach of the duty of good faith and fair dealing is Defendant's failure to conduct a good faith investigation into the complaint(s) made against Plaintiff by refusing to interview Plaintiff for their investigation even though Plaintiff was willing and able to participate in the investigation, and then substantiating the complaint against Plaintiff and using it as justification to place Plaintiff on administrative leave.

296.    In essence, Defendant manufactured a reason to place Plaintiff on administrative

36

Case 1:26-cv-04873   Document 1   Filed 06/09/26   Page 46 of 51

leave in bad faith.

297. Another example occurred when Kyle told Plaintiff that she either had to submit to a performance management plan based on allegations which were untrue or resign her position.

298. When confronted with facts that belied the allegations Kyle had laid as foundation for his claims that Plaintiff needed a performance management plan, Kyle refused to acknowledge that his allegations were untrue.

299. Another example of Defendant's breach of the duty of good faith and fair dealing is Defendant first representing that it would investigate Plaintiff's complaint of October 22, 2025, and thereafter refusing to do so.

300. As a result of Defendant's conduct, Plaintiff has been damaged an amount to be determined at trial.

**AS AND FOR AN EIGHTH CAUSE OF ACTION**
**NEGLIGENT SUPERVISION**

301. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs with the same force and effect as if set forth at length herein.

302. Plaintiff's former teammates spread false rumors about Plaintiff's professionalism to her colleagues at Everlaw.

303. Defendant had a duty to supervise Plaintiff's former teammates.

304. Defendant knew that Plaintiff's former teammates engaged in harmful conduct, to wit: spreading false rumors about Plaintiff's professionalism.

305. Defendant breached its duty by failing to adequately supervise Plaintiff's former teammates.

306. As a result of Defendant's breach of its duty to supervise, Plaintiff has been

37

damaged in an amount to be determined at trial.

### AS AND FOR AN NINTH CAUSE OF ACTION
### NEGLIGENT RETENTION

307. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs with the same force and effect as if set forth at length herein.

308. Defendant knew that Plaintiff's former teammates were spreading rumors about her.

309. Defendant retained Plaintiff's former teammates despite knowing that they were spreading rumors about Plaintiff.

310. As a result of Plaintiff's former teammates' actions, Plaintiff has been damaged in an amount to be determined at trial.

**WHEREFORE,** Plaintiff seeks compensatory damages in excess of the jurisdictional minimum, liquidated damages, reasonable costs, disbursements, interest, attorney's fees incurred in this action; and any further and other relief which is deemed just and proper.

Dated: Brooklyn, New York
May 18, 2026

Respectfully submitted,
Trachtman & Poler Law LLC

By:_____
Laura M. Trachtman
Attorney for Plaintiff
75 Main Street Suite 810
Brooklyn, New York 11201
M: +1 (917) 676-7317
E: laura@trachtmanpoler.com

38

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| ANNA SCHNITTER, | Index No. |
| Plaintiff, | |
| -against- | **Verification** |
| EVERLAW, INC. | |
| Defendant. | |

STATE OF NEW YORK      )
                                          ) ss.:
COUNTY OF NEW YORK   )

ANNA SCHNITTER, being duly sworn, deposes and says:

I am the Plaintiff in this action. I have read the foregoing Verified Complaint and know the contents thereof.  The same are true to my own knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

*Anna Schnitter*
_____
Anna Schnitter

Sworn to before me this
18th Day of May, 2026

_____
Laura M. Trachtman
Notary Public, State of New York
No. 02TR6271029
Qualified in County of Kings
Commission Expires 10/29/2028

39

# Exhibit 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ANNA SCHNITTER, | Civil Action No. |
| Plaintiff, | |
| -against- | |
| EVERLAW, INC., | **DECLARATION OF** |
| | **CAMERON MENTEER** |
| Defendant. | |

**CAMERON MENTEER,** hereby declares and states as follows:

1.      I am over 18 years of age, and I am employed by Defendant Everlaw, Inc. ("Everlaw") as Controller. In this capacity, I have confirmed the facts contained in this Declaration through review of relevant business records, which are kept in the ordinary course of business. If called as a witness, I could testify competently to each of the facts set forth in this Declaration.

2.      In my capacity as Controller, I have access to the personnel and payroll records for current and former Everlaw employees, which are maintained in the ordinary course of business. I have reviewed Plaintiff Anna Schnitter's ("Plaintiff") personnel file and payroll records, which indicate the following: (a) Plaintiff began full-time employment at Everlaw on June 11, 2018; (b) she is currently employed by Everlaw; (c) Plaintiff is classified as an exempt employee and earns a base salary of $125,000 per year, paid bi-weekly; and (d) Plaintiff has represented that her current and permanent physical address is in New York, New York.

3.      As Controller, I am familiar with and have access to Everlaw's business records that detail its corporate structure. Based on my review, at the time this action was filed and

FP 63695772.2

continuing to the present, Everlaw was, and still is, a Delaware corporation with its principal place of business at 2101 Webster Street, Suite 1500, Oakland, California 94612.

4.      Everlaw's corporate headquarters is in Oakland, California, which serves as the center for the company's direction, control, and coordination of its activities.

I declare under the penalty of perjury under the laws of the United States and California that the foregoing is true and correct.

Executed on June 9, 2026 at Oakland, California.

*Cameron Menteer*

_____

CAMERON MENTEER

2